IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

AMERICAN STRATEGIC INSURANCE
CORP.,

    Plaintiff,

    v.                                                Civil Action No. PX-15-2045

SCOPE SERVICES, INC.

    Defendant.

******

**MEMORANDUM OPINION**

Pending is a Motion to Exclude the expert report and testimony of Robert Panunto, ECF No. 57, and a Motion for Summary Judgment, ECF No. 57, filed by Defendant Scope Services, Inc. The issues are fully briefed and a hearing was held on September 11, 2017. For the reasons stated below, Defendant's Motion to Exclude and for Summary Judgment is granted.

## I.    BACKGROUND

**A. Factual Background**

The following facts are undisputed. On January 29, 2013, Scope Services, Inc. ("Scope Services") replaced a residential meter located at 19326 Elderberry Terrace in Germantown, Maryland, pursuant to a contract with Potomac Electric Company ("Pepco"). *See* Amended Complaint, ECF No. 24. The replacement procedure required a Scope Services employee, Garron Jackson, to remove the existing electric meter and "plug" a new AMI electric "smart"

1

meter into the meter base.  *See* Jackson Dep. 34:13-16, ECF No. 60-2.  On March 23, 2013, a fire originating within the home caused extensive damage to the property.

The owner of the damaged townhouse, James Timmerman, Jr., received over $154,000 in payment from his insurance company, American Strategic Insurance Corporation ("ASIC"), for property damage resulting from the fire.  *See* Amended Complaint, ECF No. 24 at ¶16.  ASIC now seeks recovery of these payments from Scope Services, alleging that Defendant's professional negligence was a direct and proximate cause of the March 23rd fire.  *See* Amended Complaint, ECF No. 24 at ¶18.  Plaintiff avers specifically that the fire originated at the base of the meter pan, where Pepco's service entrance cable connected to the meter, because of high resistance contact between the new meter and the meter base.  *See* ECF No. 60-7 at 5–7. Plaintiff's singular theory of liability is that the fire would have never happened but for the Defendant's failure to follow proper meter installation procedures.  *See* Amended Complaint, ECF No. 24 at ¶20.

### B.  Procedural Background

On July 13, 2015, ASIC filed its complaint against Pepco, alleging professional negligence.  ECF No. 1.  ASIC amended its complaint on November 12, 2015, adding the current defendant, Scope Services, Inc.  ECF No. 24.  The Plaintiff then dismissed all claims against Pepco on April 18, 2016.  ECF No. 36.  Scope Services answered the amended complaint on December 12, 2015 and discovery ensued.  After the close of discovery, Scope Services filed its Motion to Strike Plaintiff's Expert Designation and Motion for Summary Judgment on January 27, 2017.  ECF No. 57.

## II. DISCUSSION

**A. Defendants' Motion to Exclude the Expert Report and Testimony of Robert Panunto**

Because this action is properly before the Court on diversity jurisdiction, Maryland choice-of-law rules apply. *See Wells v. Liddy*, 186 F.3d 505, 521 (4th Cir. 1999) ("A federal court sitting in diversity must apply the choice-of-law rules from the forum state."). For causes of action sounding in tort, Maryland adheres to the *lex loci delicti* rule, applying the substantive law of the state in which the alleged tort took place. *Philip Morris Inc. v. Angeletti*, 358 Md. 689, 744–45 (2000).

Under Maryland law, the plaintiff "must prove the existence of four elements: a duty owed to him (or to a class of which he is a part), a breach of that duty, a legally cognizable causal relationship between the breach of duty and the harm suffered, and damages." *Jacques v. First Nat'l Bank,* 307 Md. 527, 531 (1986). Expert testimony is generally required to establish the standard of care "when the subject of the inference is so particularly related to some science or profession that it is beyond the ken of the average laymen." *Jones v. Godfrey*, No. RWT-04-3379, 2008 WL 1701088 at *13 (D. Md. Mar. 3, 2008) (quoting *Virgil v. "Kash 'N' Karry" Service Corp.*, 61 Md. App. 23, 31 (1984)). Here, the Plaintiff's negligence claim turns on the adequacy of Scope's procedures for installing a "smart" electric meter at 19326 Elderberry Terrace. *See* ECF No. 58 at 1–2. Because the proper procedure for electric meter installation is "simply not something that ordinary people would know," *Jones v. Reichert Jung, Inc.*, 211 F. Supp. 2d 661, 668 (D. Md. 2002), the Plaintiff must offer expert testimony establishing the standard of care. "If the plaintiff presents no expert when one is needed, then the trial court may rule, in its general power to pass upon the sufficiency of the evidence, that there is not sufficient

3

evidence to go [to] the jury." *Jones v. State*, 425 Md. 1, 26 (2012) (quoting *Rodriguez v. Clarke*, 400 Md. 39, 71, (2007)).

The Defendant urges the court to strike Plaintiff's expert designation of Ronald J. Panunto ("Mr. Panunto" or "Panunto") pursuant to Federal Rule of Evidence 702 ("Rule 702") for two reasons.[1] First, the Defendant argues that Mr. Panunto is not qualified to act as an expert witness in this matter because he does not have specific experience installing electric "smart" meters, but rather possesses general expertise in the fields of electrical engineering and fire investigation. *See* ECF No. 61 at 5–6. Second, Defendant contends that Mr. Panunto's testimony does not properly establish the industry standard of care. ECF No. 58 at 5–9. In response, the Plaintiff does not argue that this action is in a small class of professional negligence for which no standard of care expert testimony is required. *See Crockett v. Crothers*, 264 Md. 222, 224 (1972) ("[T]here may be instances where the negligence is so gross or that which was done so obviously improper or unskillful as to obviate the need for probative testimony as to the applicable standard of care."). Rather, Plaintiff claims Mr. Panunto's opinion passes muster under Rule 702.

Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

---

[1] Although Plaintiff's negligence claim sounds in Maryland common law, the Federal Rules of Evidence apply to questions of expert admissibility. *See Scott v. Sears, Roebuck & Co.*, 789 F.2d 1052, 1054 (4th Cir. 1986) ("[T]he admissibility of expert testimony in a federal court sitting in the diversity jurisdiction is controlled by federal law. State law, whatever it may be, is irrelevant.").

4

Fed. R. Evid. 702. Courts have distilled Rule 702's requirements into two crucial inquiries: whether the proposed expert's testimony is relevant and reliable. *Kumho Tire*, 526 U.S. 137, 141 (1999); *U.S. v. Forest*, 429 F.3d 73, 80 (4th Cir. 2005); *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 260 (4th Cir. 1999). "The trial court must carry out the special gatekeeping obligation of ensuring that expert testimony meets both requirements." *Kumho Tire*, 526 U.S. at 147. The party offering the expert testimony bears the burden of establishing its admissibility by a preponderance of evidence. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).

### 1. The Qualifications of Robert Panunto

As a threshold matter, a witness must be qualified as an expert by knowledge, skill, experience, training, or education. Fed. R. Evid 702. When a party challenges an expert's qualifications, "the test for exclusion is a strict one, and the purported expert must have neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) (quoting *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989)). The Advisory Committee Notes to Rule 702 state that formal scientific or academic training and methodology is not a necessary predicate to testimony as an expert. Rather, experience alone, or in conjunction with "other knowledge, skill, training or education," can provide a sufficient foundation for expert testimony. *See also Kumho Tire*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). "Experiential testimony need not 'rely on anything like the scientific method.'" *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 345 n.9 (D. Md. 2011) (quoting *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007)).

5

An expert's opinion testimony, whether based on specialized education, training, or experience alone, is "helpful to the trier of fact, and therefore relevant under Rule 702, only to the extent the expert draws on some special skill, knowledge or experience to formulate that opinion" concerning the particular issue or product before the court. *Shreve v. Sears, Roebuck & Co.,* 166 F. Supp. 2d 378, 393 (D. Md. 2001). The fit between an expert's specialized knowledge and experience and the issues before the court need not be exact. *Id.* at 392. Rule 702 does not "create[ ] a schematism that segregates expertise by type while mapping certain kinds of questions to certain kinds of experts . . . the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire*, 526 U.S. at 151–52.

Defendant contends Mr. Panunto possesses only "general experience" in his field and does not meet the requirements of Rule 702. *See* ECF No. 61 at 5. Mr. Panunto concedes that he does not have specific experience, education, or training in the installation of electric "smart" meters. *See* Panunto Dep. 24:12 – 25:17, ECF No. 58-3. However, Mr. Panunto has more than fifty years' experience in the field of electrical engineering, including sixteen years in forensic analysis of failed electrical equipment, and thirty years as an electrical engineer and manager for Pennsylvania's largest electric and natural gas public utility company. ECF. No. 58-5 at 30–33. In the course of his work, Mr. Panunto has installed and overseen electrical systems, including residential meters. Panunto Dep. 17:7 – 20:7, ECF No. 58-3. Mr. Panunto is certified in forensic professional engineering and fire and explosion investigation. Panunto Dep. 14: 9–12, ECF No. 58-3. He is also trained in Kepner-Tregoe and Root-Cause Analysis of failed electrical systems and equipment. ECF No. 60 at 5. Mr. Panunto possesses extensive experience as an expert witness in utility-related litigation. *See* ECF No. 58-5 at 36–43.

6

Moreover, Mr. Panunto's training and experience in electrical engineering, forensic investigation, and utility installation, albeit not specifically related to electric "smart" meter installation, is far more extensive *and* relevant to the issues put forth than the witnesses rejected by the court in *Shreve* and *JFJ Toys*. *See* S*hreve*, 166 F. Supp. 3d at 393 (witness with no professional experience in the design, manufacture, operation or safety of outdoor equipment was not qualified to testify as to the safe design and operation of snow throwers); *JFJ Toys, Inc., et al v. Sears Holding Corporation, et al*, 237 F. Supp. 3d 311, 324–25 (D. Md. 2017) (defense witness employed by the defendants with no experience, training, or education in the relevant field could not act as a Rule 702 expert witness). Accordingly, the Court finds that Mr. Panunto is qualified to testify as an expert in the field of electric meter installation.

**2. Mr. Panunto's Standard of Care Opinion**

In the September 11, 2017 hearing, Plaintiff argued that Mr. Panunto's qualifications alone were sufficient to admit his standard of care testimony under Rule 702. Plaintiff fails to appreciate, however, that the court's analysis "does not end with its conclusion that an expert is qualified to testify about a given matter . . . [T]he court's gatekeeping function [also] focuses on an examination of the expert's methodology." *Smith v. Ford Motor Co.* 215 F.3d 713, 718 (7th Cir. 2000). Rule 702 requires the proffered expert testimony be sufficiently reliable to assist the trier of fact in understanding the evidence or determining a fact at issue. *See Oglesby v. General Motors Corp.*, 190 F.3d 244, 249–50 (4th Cir. 1999). The expert opinion must be based on "specialized *knowledge* and not on belief or speculation, and inference must be derived using scientific or other valid methods." *Ogelsby*, 190 F.3d at 250. A court need not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert [where there is] simply too great an analytical gap between the data and the opinion proffered." *Pugh v.*

7

*Louisville Ladder, Inc.*, 361 F. App'x 448, 454 n.4 (4th Cir. 2010); *accord Alevromagiros v. Hechinger Co.*, 993 F.2d 417, 421 (4th Cir. 1993) ("[The expert witness] testified to no customs of the trade, referred to no literature in the field, and did not identify the reasonable expectations . . . we are unprepared to agree that 'it is so if an expert says it is so.'") (citation omitted). "Expert testimony rooted in subjective belief or unsupported speculation does not suffice." *Zuckerman v. Wal-Mart Stores E., L.P.*, 611 F. App'x 138, 138 (4th Cir. 2015) (quoting *Daubert v Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 (1993)) (internal quotation marks omitted).

The trial judge retains "broad latitude" to determine reliability of an expert witness's testimony and "may consider one or more" of factors articulated in *Daubert v Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 (1993). *See also Kumho Tire*, 526 U.S. at 142. Ultimately, the trial court's gatekeeping role guarantees that "an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. Reliability is "determined by the 'principles and methodology' employed by the expert," *Holesapple v. Barrett,* 5 Fed. App'x 177, 179 (4th Cir. 2001), and the Court may look for a discernible basis in "government or industrywide standard" or regular practices in the industry. *Conrad v. CSX Transp., Inc.*, No. MJG-14-51, 2015 WL 3797873 at *5(D. Md. June 17, 2015), *aff'd* 633 Fed. App'x 134 (4th Cir. 2016). Thus, regardless of Mr. Panunto's qualifications, his testimony may only be admitted if his opinion is reliable. *See, e.g., Conrad*, 2015 WL 3797873 at *5 ("[Plaintiff] would seek to have the Court accept [the] expert opinion based on his qualifications, his conclusions, and his assurances of reliability. Under *Daubert*, that's not enough."). The Court finds that Mr. Panunto's opinions fall short in this regard.

Mr. Panunto offers a six part standard of care for the installation of electric "smart" meters. These six parts are best understood when divided into two categories. Parts one through three address adequate preparation and tools necessary for proper meter installation, while parts four through six focus on the meter installation procedure itself. Specifically, Mr. Panunto's six steps are:

1. Provide meter technicians with field reference manuals and instructions on how to correctly and safely change out meters regardless of that technician's experience;
2. Provide meter technicians with an inspection checklist to document that all inspection steps were actually performed properly and safely;
3. Provide meter technicians with an assistant to help in changing out the meters and to confirm that all inspection steps were performed correctly and safely;
4. Take more than two minutes to complete the proper and safe inspection of the existing meter, meter base female clips, and meter base before installing the new meter;
5. Clean the existing meter base female clips of corrosion buildup prior to installing the new mete; *and*
6. Test the tension on the existing meter base female clips prior to inserting the new meter.

At Panunto's deposition, he was asked repeatedly to provide the factual basis for claiming that the six steps constitute the standard accepted in the industry of meter installation. Panunto offered little to no support. The closest he came was that an "inspection checklist," is required as the "industry standard . . . to be initialed after each step is completed so that no steps are overlooked, skipped or forgotten." ECF No. 60-9 at 5. Panunto provides no further basis beyond claiming that Scope's checklist was inadequate. *See* Panunto Dep. at 210: 19–22, ECF No. 58-3; ECF No. 60-9 at 5.

As to the remaining two preparation steps, Mr. Panunto openly admitted that he was unaware if providing an assistant to the installer is typical across the industry. *Id*.

Mr. Panunto further claimed it to be "unconscionable" for an electrical contractor to change a meter without detailed instructions or field manual on hand, ECF No. 60-9 at 1, but provided no factual basis supporting this contention in either his deposition testimony or expert reports.

As to the installation steps (4-6), Mr. Panunto described his claimed standard as follows:

> A: . . . What you need to do is, to de-energize service to the meter box. When you pull the meter box, all you do is de-energize service to the load-side terminals. The line-side terminals are still hot. So the step would be to de-energize the top terminals, pull the meter, then you can pull the meter safely because there's no voltage or current involved at all. Then you should get an emery paper or a steel brush to clean off the insides of the female clips on the meter base. That should be all cleaned and polished. You should wipe down the meter base to get any kind of surface contamination off. Then you should measure the tension of the clips. After all of that has been done, then you should insert the meter, then take a resistance check from the line-side terminal to the load-side terminal to make certain you have sufficiently low resistance path through the meter. That is the only correct and safe way to do it.

Panunto Dep. at 201: 13 – 202: 13, ECF No. 58-3.

However, when pressed regarding the basis for this articulated industry standard, Panunto offered nothing:

> Q: Where do I find the procedure that you just specified?
> A: I have no idea.
> Q: Okay. So it's not written down anywhere?
> A: I don't know if it's written down or not.
> Q: Okay. Where did you get that from?
> A: It's just commonsense. That's electrical testing.
> Q: Okay . . . . Are you aware of any other utility companies that employ that procedure?
> A: I don't know whether they do that or not.

Panunto Dep. at 202: 14 – 203: 7, ECF No. 58-3. In fact, Panunto expressly *disavowed* that any other entity employs his articulated procedure for installing smart meters:

> Q: And again, is that written down anywhere, is that requirement?
> A: No.
> [ . . .]
> Q: You're not aware of utilities across the board using that procedure?

10

> A: No.
> Q: All right. So there's no actual standard that requires that?
> A: Not that I'm aware of.
> Q: All right. With respect to actually de-energizing the meter itself before removing the old meter and placing the meter, is that written down anywhere as a standard that is required that you --
> A: Not that I'm aware of.
> **Q: And you're not aware of utility companies routinely using that method to replace meters?**
> **A: That's correct. I am not.**
> **Q: Is it actually the opposite, they routinely don't do that?**
> **A: I would say typically they do not.**
> Q: Okay. Is that true as well for this measuring the meter clips and measuring the resistance that they typically do not do those two things?
> A: That's correct. They typically do not.

Panunto Dep. at 207: 21 – 209: 6, ECF No. 58-3 (emphasis added).

In this way, Panunto's testimony on standard of care amounts to little more than his personal views on the proper method of smart meter installation.[2] Mr. Panunto fails to identify – and often denies – an adequate foundation for his opinions in adequate experience, theory, written materials, or industry custom and practice. Accordingly, Panunto sets forth an "exceptionally high" standard of care without foundation "in government regulation, industry standard or common practice." *Montgomery v. CSX Transportation Inc.*, 230 F. Supp. 3d 447, 454 (D. Md. 2017). "The absence of a discernable, reliable, independent basis" supporting Panunto's opinion, therefore, compels exclusion. *Montgomery*, 230 F. Supp. at 454; *see also Conrad v. CSX Transp., Inc.*, No. MJG-14-51, 2015 WL 379873 at *4 – *5 (D. Md. June 17, 2015) (highlighting that a qualified expert opinion's testimony, which was not supported by industry rules or requirements and based in "common sense," was not enough to establish the standard of care).

---

[2] Plaintiff does not deny that this is the case. In the September 11, 2017 hearing, Plaintiff argued that because of Mr. Panunto's qualifications and experience, his personal opinions alone were sufficient to establish a standard of care. At the hearing, Plaintiff also claimed – for the first time – that "there is no standard of care" as to the installation of smart meters, an assertion which plainly contradicts Plaintiff's previous arguments as well as Panunto's own opinion claiming to establish an applicable standard of care as to smart meter installation.

Plaintiff argues that *Friendship Heights Associates v. Vlastimit Koubek, A.I.A.*, 785 F.2d 1154 (4th Cir. 1986) saves Panunto's opinion. In *Friendship Heights*, the United States Court of Appeals for the Fourth Circuit reversed the trial court's determination that an expert witness' "alleged failure to identify a minimum standard of care [was] a sufficient ground for disqualifying him as an expert." *Friendship Heights*, 785 F.2d at 1162. Importantly, however, this case differs from *Friendship Heights* in two material respects. First, the *Friendship Heights* court focused on whether the opinion was sufficiently definite and adequately supported. *Id.* at 1162–63. Here, by contrast, the Panunto did not offer *any* support to undergird his articulated standard of care despite repeated invitation for elaboration. *See, e.g.*, Panunto Dep. at 202: 14–24, 208: 12–17, and 214: 1–4, ECF No. 58-3. Panunto's opinion, therefore, is "connected to existing data only by the *ipse dixit* of the expert." *Pugh v. Louisville Ladder, Inc.*, 361 F. App'x 448, 454 n.4 (4th Cir. 2010).

Second, the expert witness's standard of care opinion in *Fairmont Heights* was based on reference to industry guidelines. *Friendship Heights*, 785 F.2d at 1161–62 (citing *Crockett v. Crothers*, 264 Md. 222, 285 (1972) for the proposition that an expert can define the standard of care under Maryland law by describing "steps ordinarily taken" by those in the profession). Accordingly, the Fourth Circuit determined that the standard of care opinion was sufficiently supported. By contrast, Mr. Panunto alternately claimed ignorance of industry practice or flatly denied that his enumerated procedure was used in the relevant field. *See* Panunto Dep. at 206: 24–209: 6, 203: 4–7, 208: 18 – 209: 6, and 214: 5–6, ECF No. 58-3.

Indeed, it bears noting that *Friendship Heights* does not replace the Maryland common law requirement to first establish the appropriate standard of care through reliable expert witness testimony. *See, e.g., Montgomery v. CSX Transportation*, 230 F. Supp. 3d 447, 454 (D. Md.

2017) ("While [the witness] is not unqualified to deliver an expert opinion . . . this Court does not find that Mr. Clauser's opinion is the product of 'reliable principles and methods.'") (quoting Fed. R. Evid. 702(c)); *Jones v. Godfrey*, No. RWT-04-3379, 2008 WL 1701088 at *13 (D. Md. Mar. 3, 2008). This is for good reason. Without reliably supported standard-of-care opinion testimony, the factfinder cannot answer whether the defendant's actions fell below standards commonly held by those in the profession. Unfortunately, Mr. Panunto's testimony at best amounts to his personal views on what the industry standard of care *should* be. This is insufficient under Rule 702, and thus Defendant's motion to exclude Panunto's standard of care testimony is granted.[3]

### B. Defendant's Motion for Summary Judgment

The Defendant has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure because of Plaintiff's failure to establish a *prima facie* negligence case. ECF No. 71 at 1. A court may enter summary judgment only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). The moving party bears the burden of showing there is no genuine issue as to any material fact. *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

---

[3] Defendant alternatively challenges the reliability and sufficiency of Panunto's opinion that the faulty installation procedures were the proximate cause of the fire. Because this Court grants Defendant's motion to exclude as to the only standard of care expert testimony offered by Plaintiff, Defendant's motion for summary judgment must also be granted. *See infra.* Accordingly, this Court need not reach whether Panunto's causation opinion is admissible under Rule 702.

13

As a simple matter of law, the Plaintiff cannot succeed in a negligence action without expert testimony establishing the applicable standard of care. *See, e.g., Schultz v. Bank of America, N.A.*, 413 Md. 15, 41 (2010) ("In cases such as this . . . where the alleged violation of the duty of ordinary care is not obvious, expert testimony is necessary to assist the trier of fact in making its determination. Petitioner did not provide the necessary expert testimony, and accordingly, the trial court should not have submitted either of Petitioner's claims to the jury."); *Jones v. State*, 425 Md. 1, 26 (2012) (quoting *Rodriguez v. Clarke*, 400 Md. 39, 71 (2007) ("If the plaintiff presents no expert when one is needed, then the trial court may rule, in its general power to pass upon the sufficiency of the evidence, that there is not sufficient evidence to go [to] the jury."). On the industry standard of care as to smart meter installation, Plaintiff only offers Panunto's excluded opinions. With this complete absence of proof, Plaintiff cannot sustain its negligence claim. Defendant's motion for summary judgment, therefore, must be granted.

### III. CONCLUSION

Defendant's motion to exclude the expert report and testimony of Robert Panunto is granted because his opinions were non-substantiated speculation as to the appropriate standard of care for the installation of electric smart meters. Because Maryland common law requires admissible expert testimony regarding the standard of care in professional negligence cases, the Plaintiff has failed to establish its *prima facie* case of negligence and the Defendant is entitled to summary judgment. A separate Order follows.

| | |
|---|---|
| 9/15/2017 | /S/ |
| Date | Paula Xinis<br>United States District Judge |